**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **JOSHUA HARMAN, on behalf of** | § | |
| **THE UNITED STATES OF AMERICA,** | § | |
| | § | |
| **PLAINTIFF/Relator,** | § | **CIVIL ACTION NO. 2:12-cv-0089** |
| | § | |
| **v.** | § | |
| | § | |
| **TRINITY INDUSTRIES, INC. and** | § | |
| **TRINITY HIGHWAY PRODUCTS, LLC,** | § | |
| | § | |
| **DEFENDANTS.** | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Josh B. Maness
(Texas State Bar No. 24046340)
PO Box 1785
Marshall, TX  75671
Ph: (903) 407-8455
manessjosh@hotmail.com

Justin Kurt Truelove
(Texas State Bar No. 24013653)
TRUELOVE LAW FIRM, PLLC
100 West Houston
Marshall, TX  75670
Ph: (903) 938-8321
Kurt@truelovelawfirm.com

Nicholas A. Gravante, Jr.
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY  10022
Ph: (212) 446-2300
ngravante@bsfllp.com

George F. Carpinello
BOIES, SCHILLER & FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, NY  12207
Ph: (518) 434-0600
gcarpinello@bsfllp.com

Karen Dyer
BOIES, SCHILLER & FLEXNER LLP
121 South Orange Avenue, Suite 840
Orlando, FL  32801
Ph: (407) 425-7118
kdyer@bsfllp.com

Dated:  July 15, 2013

## TABLE OF CONTENTS

Table of Authorities ......................................................................................................... ii

Preliminary Statement ...................................................................................................... 1

Factual Allegations of the Complaint ............................................................................... 4

Argument .......................................................................................................................... 6

     I.     This Action Is Not Barred by the Public Disclosure Provisions of the FCA.......... 6

          A.     Because Harman Made the Public Disclosure, He Is Not Barred
               From Bringing This Action ...................................................................... 7

          B.     Harman Is Not Barred Under the Earlier Version of the Statute ............. 11

     II.     Harman States a Claim for Trinity's Violation of the FCA................................. 14

          A.     Trinity Made a False Statement or Claim for Payment to the
               Federal Government................................................................................ 14

          B.     Harman's Complaint Is Not Based on the 2005 Submission to
               the FHWA .............................................................................................. 16

          C.     Harman's Complaint Is Not Barred By Any Statute of
               Limitations ............................................................................................ 18

          D.     Trinity's Fraudulent Statements and Non-Disclosures Were Directly
               Responsible for Payments by the Federal Government ........................... 20

          E.     Harman Is Not Challenging the FHWA's Decision-Making
               Authority ............................................................................................... 21

     III.     Harman's Claims Satisfy the Requirements of Rule 9(b).................................... 24

          A.     Harman States the Specifics of Trinity's Fraudulent Scheme With
               Sufficient Particularity to Satisfy FRCP 9(b) ......................................... 25

Conclusion ...................................................................................................................... 30

## TABLE OF AUTHORITIES

### Cases

*Abbott v. B.P. Exploration and Production, Inc.*,
    781 F. Supp. 2d 453 (S.D.Tex. 2011) ................................................................. 29

*Bell Atl. Corp. v. Twombley*,
    550 U.S. 544 (2007) ........................................................................................... 16

*Paterson v. Weinberger*,
    644 F.2d 521 (5th Cir. 1981) ............................................................................... 5

*Riley v. Saint Luke's Episcopal Hospital*,
    252 F.3d 749 (5th Cir. 2001) ............................................................................. 25

*Smith v. United States*,
    287 F.2d 299 (5th Cir. 1961) ............................................................................. 21

*Tuchman v. DSC Commc'ns Corp.*,
    14 F.3d 1061 (5th Cir. 1994) ............................................................................. 32

*United States ex rel. Atkins v. McInteer*,
    470 F.3d 1350 n.17 (11th Cir. 2006) ........................................................... 25, 32

*United States ex rel. Barrett v. Johnson Controls, Inc.*,
    2003 WL 21500400 (N.D.Tex. Apr. 9, 2003) ................................................... 21

*United States ex rel. Bennett v. Medtronic, Inc.*,
    747 F. Supp. 2d 745 (S.D.Tex. 2010) ............................................................... 32

*United States ex rel. Branch Consultants, LLC v. Allstate Ins. Co.*,
    668 F. Supp. 2d 780 (E.D. La. 2009) ........................................................... 13, 14

*United States ex rel. Colquitt v. Abbott Labs*,
    864 F. Supp. 2d 499 (N.D.Tex. 2012) ............................................................... 14

*United States ex rel. Davis v. Lockheed Martin Corp.*,
    2010 WL 4607411 (N.D.Tex. Nov. 15, 2010) ................................................... 29

*United States ex rel. DeKort v. Integrated Coast Guard Systems*,
    705 F. Supp. 2d 519 (N.D.Tex. 2010) ..................................................... 22, 25, 29

*United States ex rel. Doe v. Dow Chem. Co.*,
    343 F.3d 325 (5th Cir. 2003) ............................................................................. 31

*United States ex rel. Federal Recovery Services v. Crescent City EMS, Inc.*,
    72 F.3d 447 (5th Cir. 1995) ................................................................ 9, 10, 11, 13

*United States ex rel. Fried v. W. Indep. Sch. Dist.*,
    527 F.3d 439 (5th Cir. 2008) ................................................................ 12, 14

*United States ex rel. Foster v. Bristol-Myers Squibb Co.*,
    587 F. Supp. 2d 805 (E.D.Tex. 2008) ................................................................ 20, 21

*United States ex rel. Garibaldi v. Orleans Parish School Board*,
    21 F. Supp. 2d 607 (E.D.La. 1998) ................................................................ 11

*United States ex rel. Gonzalez v. Fresenius Med. Care North Amer.*,
    2010 WL 1645969 (W.D.Tex. Jan 21, 2010) ................................................................ 21

*United States ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ................................................................ *passim*

*United States ex rel. King v. Alcon Labs., Inc.*,
    232 F.R.D. 568 (N.D.Tex. 2005) ................................................................ 29, 30, 32

*United States ex rel. Laird v. Lockheed Martin Engineering & Science Services Co.*,
    336 F.3d 346 (5th Cir. 2003) ................................................................ 11, 12

*United States ex rel. Lockey v. City of Dallas*,
    2013 WL 268371 (N.D.Tex. Jan. 23, 2013) ................................................................ 8

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
    575 F.3d 458 (5th Cir. 2009) ................................................................ 25

*United States ex rel. McKenzie v. Bellsouth Telecommunications, Inc.*,
    123 F.3d 935 (6th Cir. 1997) ................................................................ 11

*United States ex rel. Nowak v. Medtronic, Inc.*,
    806 F. Supp. 2d 310 (D. Mass. 2011) ................................................................ 7, 30

*United States ex rel. Ondis v. City of Woonsocket*,
    587 F.3d 49 (1st Cir. 2009) ................................................................ 13

*United States ex rel. Paranich, D.C.*,
    396 F.3d 326 (3d Cir. 2005) ................................................................ 11

*United States ex rel. Polansky v. Pfizer, Inc.*,
    2009 WL 1456582 (E.D.N.Y. May 22, 2009) ................................................................ 31

*United States ex rel. Rafizadeh v. Continental Common, Inc.*,
    553 F.3d 869 (5th Cir. 2008) ................................................................ 27

*United States ex rel. Reagan v. East Texas Medical Center Regional Health Care System*,
  384 F.3d 168 (5th Cir. 2004) ........................................................................... 11, 13

*United States ex rel. Russell v. Epic Healthcare Mgmt. Grp.*,
  193 F.3d 304 (5th Cir. 1999) ........................................................................... 25, 29

*United States ex rel. Siller v. Beckton Dickinson & Co.*,
  21 F.3d 1339 (4th Cir. 1994) ................................................................................ 10

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
  125 F.3d 899 (5th Cir. 1997) ........................................................................... 25, 26

*United States ex rel. Willard v. Humana Health Plan of Texas Inc.*,
  336 F.3d 375 (5th Cir. 2003) ................................................................................ 30

*United States ex. rel. Erkstine v. Baker*,
  213 F.3d 638, 2000 WL 554644 (5th Cir. 2000) .................................................. 20

*Vermont Agency of Natural Res. v. United States ex rel. Stevens*,
  529 U.S. 765 (2000) ............................................................................................. 24

*Williams v. WMX Techs., Inc.*,
  112 F.3d 175 (5th Cir. 1997) ........................................................................... 26, 29

**Statutes**

31 U.S.C. § 3730 (e) (4) (2008) ................................................................................ 6

31 U.S.C. § 3730(e)(4)(A) (2010) ................................................................... 7, 8, 10

31 U.S.C. § 3730(e)(4)(B) (2010) ....................................................................... 8, 11

31 U.S.C. § 3731(b) .................................................................................................. 20

**Rules**

Fed. R. Civ. P. 9(b) ....................................................................................... *passim*

Fed. R. Civ. P. 12(b)(1) ............................................................................................ 5

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 1, 6

Plaintiff United States of America Ex Rel. Joshua Harman ("Plaintiff" or "Harman") respectfully submits this Memorandum of Law in response to the motion of Defendants Trinity Industries, Inc. and Trinity Highway Products, LLC (collectively "Trinity") to dismiss Plaintiff's First Amended Complaint ("Complaint").

## PRELIMINARY STATEMENT

This action, brought under the False Claims Act ("FCA"), is about a major manufacturer, Trinity, producing and selling thousands of defective guardrail terminals for use on the nation's highways. Trinity's actions not only defrauded the federal government out of millions of dollars but, far worse, also caused the deaths and serious injuries of drivers and passengers whose vehicles struck those defective terminals. Plaintiff alleges that Trinity significantly altered the previously-approved design of that terminal, *i.e.*, the ET-Plus. While this may have increased Trinity's profits by reducing Trinity's production costs and generating a new sale for almost every accident,[1] it did not improve the safety of the product. To the contrary, Trinity's major reductions to the size of the ET-Plus essentially eliminated the safety aspects of the approved model and resulted in a dangerous product.

Trinity failed to disclose these modifications to anyone, including the federal government. Moreover, Trinity fraudulently certified that this secretly modified unit was actually the tested and approved version of the ET-Plus when, in fact, Trinity knew it was not. Rather than challenge these undisputed facts[2] demonstrating Trinity's fraud, Trinity tries to divert this Court's attention with specious legal arguments.

---

[1] The tested and approved ET-Plus was designed to be reusable after an accident, but the unapproved, untested, and secretly modified ET-Plus is rarely reusable. Compl. ¶ 24. Therefore Trinity achieved increased sales over and above orders for new installations. *Id*.

[2] Of course, Trinity cannot present factual evidence on this Fed. R. Civ. P. 12(b)(6) motion, but that has not prevented Trinity from making extensive factual assertions throughout its brief, yet

1

First, Trinity argues that Harman is barred from bringing this action because *he* publicly disclosed the fraud to the federal and state governments who were victims of Trinity's fraud. That is not the law.  Harman first discovered the fraud through his own extensive investigation of hundreds of ET-Plus units installed throughout the country (and not from any public sources of information).  That is information that he alone knew and disclosed to the federal government just before filing this action.  Indeed, without Harman's direct and independent personal knowledge, no one would be aware of Trinity's fraud – that information flows directly and solely from Harman's on-site physical inspections, measurements and deconstructions of the units that Trinity produced and that have been installed on the highways since 2005.

Second, Trinity claims that Harman does not allege that Trinity caused a false claim to be made.  Harman, however, has clearly alleged that, beginning in at least 2005, Trinity knowingly made false certifications to purchasers of its ET-Plus that it was the tested and approved ET-Plus model (and not a secretly modified unit), knowing that such certifications were required for those purchasers to receive reimbursement from the federal government.  More importantly, Trinity does not – and cannot – deny that these certifications were in fact made for the very purpose of receiving compensation and that the federal government did, in fact, reimburse those purchasers based upon such false certifications.

Third, Trinity makes the disingenuous argument that Harman is challenging the 2005 decision of the Federal Highway Administration ("FHWA") which approved minor changes to the ET-Plus.  That is a red herring.  The 2005 approval was for a change in height of the guardrail that is not at issue in this action.  Moreover, Trinity made significant dimensional changes to the ET-Plus *after* the 2005 approval that it did not disclose to the FHWA and which

---

no where does Trinity contend that (1) it ever notified the FHWA of all the secret modifications that Harman uncovered; or (2) the FHWA certified the units based on those modifications.

have never been tested or approved by the federal government.  It is those undisclosed changes that have rendered the ET-Plus defective, resulting in numerous injuries and deaths on United States highways.  Thus, Harman's claims are obviously not an administrative challenge to the FHWA's decision-making process.  Indeed, Trinity's fraudulent conduct circumvented that process by concealing its changes from federal review.

Fourth, Trinity's substantive argument, that the ET-Plus as installed, was actually tested and approved, rests upon hotly-disputed questions of fact, *i.e.*:  Trinity's arguments that all the changes Trinity made (which it does not dispute making) to the ET-Plus after it passed the NCHRP 350 test were "inconsequential to functionality" (Def. Br. at 26); that there was "no uncertainty" as a matter of good engineering judgment that the changes would not impact performance (*id.*); and that the new dimensions were not "significantly different" than the version tested (*id.* at 27).  Obviously, these are questions of fact, inappropriate for a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  In any event, the numerous instances where the modified ET-Plus has failed show these factual assertions to be false.

Fifth, Trinity attempts to turn statute of limitations law on its head.  Initially, Trinity improperly applies the prior version of the FCA, rather than the version in effect at the time that this case was filed.  Under either version, however, Trinity's argument is without merit.  Trinity claims that, because it *began* defrauding customers more than six years before this action was brought, an action cannot be brought now for its continuous *and ongoing* fraud.  Such a bizarre interpretation of the law would allow Trinity to defraud the government tomorrow if it first began defrauding the government at least six years and a day ago.  That clearly is not the law.

Finally, Trinity contends that Harman's claims do not satisfy Fed. R. Civ. P. 9(b) because he has not alleged (1) a specific false statement or claim for payment; (2) that Trinity knew its certifications were false and were material to the Government's payments; and (3) which of the

Trinity entities committed the fraud.  A complete reading of the Complaint and the documents both attached and referenced in the Complaint clearly shows that Harman more than satisfied the Rule 9(b) standard.  The Complaint clearly puts Trinity on notice of its false certification of this product, shows that Trinity knew such certifications were necessary to sell the product, and that without those certifications a purchaser could not be reimbursed by the Government for installing that product.  Tellingly, Trinity does not deny that (1) the product produced and sold after 2005 was not tested and approved but was, nevertheless, so certified by Trinity; and (2) Trinity knew that these fraudulent certifications would result in payments by the Government.

## FACTUAL ALLEGATIONS OF THE COMPLAINT

Trinity's motion is based on a carefully selected and disingenuous presentation of the facts.  As alleged in the Complaint, Trinity received federal approval in January, 2000, for a specific safety device, *i.e.,* the ET-Plus, an end terminal designed and patented by Texas A & M University for standard "W beam" guardrails on the nation's highways.  Compl. ¶¶ 10, 11, 12.

As approved in 2000, the ET-Plus was a simple yet ingenious device.  The ET-Plus was mounted on the end of a w-shaped, corrugated guardrail and when a vehicle impacted the rectangular impact head, the force of the moving vehicle pushed the entire ET-Plus unit down the guardrail.  As the feeder chute of the ET-Plus moved down the guardrail, the extruder throat flattened the guardrail being fed through the feeder chute, and the flattened guardrail "ribboned" out of the extruder throat and was deflected away from both the vehicle and the road.  This process continued down the guardrail, absorbing and dissipating the force and velocity of the vehicle until it came to a halt.  *See* Compl. Ex. A at pp. 12-38.  The success of this dynamic process was dependent upon various clearance tolerances that assured that the guardrail could physically fit through the entire ET-Plus unit and both flatten and ribbon out.  If any of these crucial tolerances were not sufficiently large enough for the guardrail to pass through, the

4

restricted guardrail could become lodged in the ET-Plus which, instead of allowing the guardrail to pass through, would cause the guardrail to "throat lock" in the extruder throat and buckle, break off, or even impale the impacting vehicle and its passengers.  Ex. A at pp. 39-109.

The complete design of the ET-Plus, as originally tested for approval, was set forth in the application for that approval.  *Id.* ¶ 12.  Overall, the ET-Plus licensed to and manufactured by Trinity to the specifications of the design approved in 2000 performed successfully.  *Id.* ¶¶ 11, 12.  Between 2002 and 2005, however, Trinity began altering the design of the ET-Plus.  *Id.* ¶¶ 2, 14, 19.  No one outside of Trinity knew that these alterations resulted in significant reductions to the internal dimensions of the ET-Plus.  *Id.* ¶¶ 20, 21.  In 2005, Trinity sought further federal approval of the ET-Plus for use on 31-inch high guardrail systems.  *Id.* ¶ 21.  None of Trinity's submissions for the 2005 approval disclosed that between 2002 and 2005 Trinity had made significant changes in the size of the ET-Plus.  *Id.* ¶¶ 21, 23.  Trinity received approval in 2005 to use the ET-Plus on 31-inch high guardrail systems but, significantly, the FHWA did not approve the undisclosed changes to the ET-Plus that have nothing to do with 31-inch high guardrails.  *Id*. ¶¶ 20, 21, 29.  Indeed, the FHWA was unaware of these changes.  *Id*. Significantly, Trinity also made further undisclosed changes to the ET-Plus after seeking federal approval in 2005.  *Id.* ¶¶ 23, 33.  All of these secret changes that Trinity made to the ET-Plus were discovered *solely* by Harman during his investigation in 2011 of hundreds of ET-Plus units installed on the nation's highways.  *Id.* ¶ 9; Harman Decl. at ¶¶ 5-10.[3]  In fact, until informed by Harman in January 2012, the federal government was unaware of any hidden modifications to the ET-Plus.  *Id*. ¶ 31.  The federal government has never approved the design changes that Trinity has *never* disclosed (*id.* ¶¶ 29, 31, 32, 33) and the modified configuration of the ET-Plus

---

[3]  In response to a Fed. R. Civ. P. 12(b)(1) motion supported by evidentiary materials, Plaintiff can rebut with his own evidence.  *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

has never been tested.  The fact that Trinity made these changes, but did not tell the federal government, was conceded by Trinity's representatives, under oath, in related patent litigation in Virginia.  Harman Decl. at ¶ 11.

As a result, it is indisputable that all of the ET-Plus units manufactured *after* making these secret – and with respect to safety, crucial – changes were paid for despite the fact that these units did not conform with the design and specifications of the federally approved version of the ET-Plus.  *Id.* ¶¶ 14, 22.  Each and every ET-Plus manufactured and sold after Trinity made its secret and unapproved changes were paid for based upon Trinity's continuing certification that these units were the approved design, even though Trinity knew they were not approved.  *Id.* ¶¶ 38, 39.  These secretly redesigned and unapproved units were not only illegal for purposes of receiving payment of federal funds, they fail at an alarming rate, killing, impaling, and maiming drivers and passengers with a "safety" device that was originally designed to protect them.  *Id.* ¶ 3.

## ARGUMENT

### I.    This Action Is Not Barred by the Public Disclosure Provisions of the FCA.

Trinity first argues that Harman's pre-action disclosure of his findings to the federal and state governments, or on his website, disqualifies him as a valid relator because he made a "public disclosure."  Of course, any relator aware of not just a fraud, but a defective product that is killing and maiming people will, in all good conscience, immediately notify the Government (and the people affected) of his previously unknown discovery.  This disclosure of facts individually discovered by Harman does not bar this action.

Next, Trinity argues that there was a "public disclosure" of the facts underlying Harman's claims by Trinity's 2005 submission to the FHWA for approval to apply the ET-Plus to a 31-inch high guardrail.  That argument is absurd; as noted above, the 2005 request was based on a

fraudulent *non-disclosure*.  Trinity did not advise the FHWA of the secret changes Trinity had made prior to the 2005 limited test, nor did it ever advise the FHWA of the changes it made after the 2005 test.  The secret changes only came to light after Harman investigated and discovered that the ET-Plus devices that were being sold and installed were *not* the ones tested and approved.

Finally, Trinity vainly argues that Harman is not the original source of information underlying his Complaint because he allegedly admitted that he learned the fact underlying Trinity's fraud from "public sources."  The statement Trinity relies on, made in the defamation case, is disingenuously taken entirely out of context.  The undisputed source of Harman's information was his own investigation of over one hundred installed ET-Plus units throughout the country; his measuring and photographing of these purported-to-be ET-Plus terminals; his analysis of actual accidents involving defective ET-Plus units; and his deconstruction and analysis; all of which revealed that Trinity was selling an untested and unapproved product.

### A.    Because Harman Made the Public Disclosure, He Is Not Barred From Bringing This Action.

Trinity relies solely upon the old FCA statute, which was not in effect at the time Harman filed his Complaint.  In fact, the new version of the statute applies to at least some of Harman's claims.  In any event, even under the former statute, Harman's claims are not barred because he is indisputably the original source of any purported public disclosure of the information underlying his claims. Trinity's arguments that his claims are barred because they are based on "public disclosures" is unavailing because Harman – and no one and nothing else – is the person who discovered the information and made it public.

The current relevant statute, 31 U.S.C. § 3730(e)(4)(A) (2010),[4] reads as follows:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed –
>
> (i)     in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> (ii)    in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> (iii)   from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

Further, "original source" is defined in the statute as follows:

> For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (ii) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B) (2010).

It is clear from a reading of these provisions that a person who makes the actual public disclosure prior to bringing the action is not barred from bringing the action merely because he or she made such a disclosure.  The public disclosure bar is designed to prevent the "parasitic" relator, who is relying on the public disclosure made by the sources specified in the statute – federal proceedings, congressional and other investigations, and news media accounts – from bringing a *qui tam* action unless he or she meets the criteria for an "original source," *i.e.*, he or she had *additional* or *independent* information not made in the public disclosure or made the same disclosure to the government before the other sources made the information public.   But

---

[4]  In this new version of the statute, the inquiry into public disclosure is no longer a jurisdictional issue.  *See United States ex rel. Lockey v. City of Dallas*, 2013 WL 268371, at *5 (N.D.Tex. Jan. 23, 2013) (calling public disclosure bar an "affirmative defense").

Harman did not rely on any public disclosure:  *he* made the public disclosure – not the sources set forth in the statute – after discovering the information entirely on his own.

As the Fifth Circuit emphasized in *United States ex rel. Federal Recovery Services, Inc. v. Crescent City EMS, Inc.,* 72 F.3d 447, 452 (5th Cir. 1995) the goal of the "public disclosure" provision was to prevent "parasitic suits based on information discovered by others."  Obviously, that does not apply here, where Harman disclosed all the material information.

Even if Harman's own public disclosure were to act as a putative bar, it is clear Harman would qualify as an original source.  First, Harman disclosed the information on which the action is based to the federal government before he made the public disclosure.  Thus, under § 3730(e)(4)(A)(i), Harman is an original source.  Trinity does not contend otherwise.  Harman Decl. at ¶ 12.  Second, Harman disclosed the information to the federal government before he filed suit on March 6, 2012 (Compl. at ¶ 31; Harman Decl. at ¶ 12) and he had knowledge of material information independent of the public disclosure because he *made* the public disclosure of information he developed.  And again, Trinity does not contend otherwise.  Thus, Harman is an original source under § 3730(e)(4)(A)(ii).

Trinity effectively acknowledges this conclusion by citing *Harman's* own disclosures as the public disclosures that it claims bars Harman from bringing this case.  Def. Br. at 13-14. Trinity also acknowledges that Harman was the original source of the information because it sued Harman – twice – for defamation for revealing the facts concerning Trinity's fraud.  If there was a source independent from Harman – and Trinity does not reveal one – he or it has apparently escaped Trinity's wrath.

But Trinity argues that Harman is not an original source because he admitted in a filing in the defamation action *Trinity Industries Inc. and Texas A&M v. Harman*, Civil Action No. 2:12-cv-00046-JRG) that he had compiled the information "from public sources."  Def. Br. at 16-17,

9

quoting Docket No. 64 at 2 (April 29, 2013).  This statement is taken entirely out of context. The document quoted was Harman's reply to the plaintiff's response in opposition to Harman's motion to de-designate Exhibit A (identical to the Exhibit A attached to the Complaint herein), which was filed in the defamation action.  Harman was responding to the argument made by plaintiffs that the information contained in Exhibit A was derived from Trinity's confidential documents and therefore should not be unsealed.  Harman was pointing out that the information he discovered did not come from Trinity's confidential documents but from "public sources." Obviously, by this he meant information *independent* of Trinity's internal documents, not that the information was already publicly disclosed.

Next, Trinity argues, half-heartedly and without direct citation, that Harman could not be a public source because he obtained the information "through mining discovery and deposition testimony in another lawsuit," obviously referring to the Virginia patent litigation.  Def. Br. at 17.  But again, Trinity simply misstates the facts.  Harman learned of Trinity's fraud by his own independent investigation of the actual units installed.  The fact that Trinity never disclosed the changes to the FHWA, which Harman believed to be the case based upon his own investigation, was simply confirmed in the sworn testimony of Trinity executives who admitted that the changes were made without telling the FHWA.  Harman Decl. at ¶ 13.  The fact that Harman's company's own lawyers elicited these admissions in litigation does not make the litigation a "public disclosure," nor does it deprive Harman of being the original source.[5]

---

[5]  Only publicly-filed litigation documents constitute public disclosure. *See United States ex rel. Reagan v. E. Texas Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 174 (5th Cir. 2004) ("any information disclosed through civil litigation *and on file with the clerk's office* should be considered a public disclosure of allegations in a civil hearing for the purposes of § 3730(e)(4)(A))" (emphasis added), *quoting Federal Recovery Servs., Inc. v. United States*, 72 F.3d at 450, in turn *quoting United States ex rel. Siller v. Beckton Dickinson & Co.*, 21 F.3d 1339, 1350 (4th Cir. 1994)); *cert. denied* 513 U.S. 928 (1994); *United States ex rel. Ward v. Commercial Metals Co.*, 2007 WL 1390612, at *6 (S.D.Tex. May 9, 2007) (disclosures made in

### B.    Harman Is Not Barred Under the Earlier Version of the Statute.

Under the original statute, which has now been superseded, the Fifth Circuit originally held, reluctantly,  that although it was counterintuitive, a "public disclosure" (even one made by the relator himself) could still be a putative bar unless the relator met the definition of original source in the predecessor statute.  *United States ex rel. Laird v. Lockheed Martin Engineering & Science Services Co*., 336 F.3d 346, 356 (5th Cir. 2003).  But *Laird* may not have survived subsequent Fifth Circuit case law.  Thus, *in United States ex rel. Fried v. W. Indep. Sch. Dist*., 527 F.3d 439, 443 (5th Cir. 2008), the Fifth Circuit emphasized, citing earlier case law, that in order to be an original source, the relator must have "qualitatively different information than what had already been discovered and not merely the product of publicly disclosed information." (internal quotes omitted)), *quoting Federal Recovery Servs., Inc., 72* F.3d at 452.  Obviously, where the relator discovers the very information he makes public, the relator could never meet the "qualitatively different" test.  Yet, it would be absurd to bar a relator who actually discovered the information and made it public, but to allow a relator who relied in part on public sources, but also had some qualitatively different information, to sue.

In any event, it is clear that Harman constitutes an original source as defined under the predecessor statute:

> For purposes of this paragraph, 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to

---

pleadings, depositions and findings of fact by the court that "are all on file with the clerk of the court and available to the public" constitute a public filing); *United States ex rel. Garibaldi v. Orleans Parish School Board*, 21 F. Supp. 2d 607, 614 (E.D.La. 1998) (publicly filed documents in a civil trial are public disclosures); *United States ex rel. Paranich, D.C.*, 396 F.3d 326, 333-34 (3d Cir. 2005) (documents filed with the court and accessible to the public are public disclosures); *United States ex rel. McKenzie v. Bellsouth Telecommunications, Inc*., 123 F.3d 935, 939 (6th Cir. 1997) ("'Public disclosure' also includes documents that have been filed with a court").

the Government before filing an action under this section which is based
on the information.

31 U.S.C. § 3730(e)(4)(B) (2006).

When analyzing whether a party under this statute was an original source, the Fifth
Circuit looked at each element in turn:  (1) direct and independent knowledge, (2) of the
information alleged in the lawsuit, and (3) voluntarily provided the information to the
government before filing the action.  Examining these factors in this case, the Court must "look
to the factual subtleties of the case" to determine whether Harman is an original source. *Laird*,
336 F.3d at 356.[6]  Based upon the factual allegations of the case, Harman clearly qualifies as an
original source under the language of the pre-2010 FCA.

The original source exception requires Harman to have knowledge that is both "direct"
and "independent" in order to ensure that the *qui tam* suit is rewarding a plaintiff who was
actually involved in discovering information that led to discovery of the fraud.  *See Laird*, 336
F.3d at 356.  Direct is defined as "derived from the source without interruption or gained by the
relator's own efforts rather than learned second-hand through the efforts of others."  *Id.* at 355.
Here, Trinity's fraud was not gleaned from "[k]nowledge that is based on research into public
records, review of publicly disclosed materials, or some combination of these techniques [that] is
not direct."  *United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 59 (1st Cir. 2009)
(citing *United States ex rel. Reagan*, 384 F.3d at 178-79)).  Rather, that fraud was only revealed
through Harman's independently gained knowledge.  It was "not derived from the public
disclosure" (*United States ex rel. Reagan*, 384 F.3d at 177), but by Harman himself.  The Fifth
Circuit has found that a relator's research provides direct and independent knowledge if that

---

[6]  With respect to the old statute, the *Laird* court also stated that "a challenge under the FCA
jurisdictional bar is necessarily intertwined with the merits."  *Laird*, 336 F.3d at 350 (quotations
and citations omitted).

knowledge, as here, adds an "additional compelling fact" or a "new and undisclosed relationship between disclosed facts." *Id.* at 178.

Harman deconstructed the Trinity products himself and discovered the unreported modifications firsthand. His information is independent because it "comprise[s] 'qualitatively different information than what had already been discovered,'" such as FHWA approval letters and FOIA requests.  No public documents revealed that Trinity had secretly changed the dimensions.  Harman discovered it by actually measuring ET-Plus devices installed on the highways. *See United States ex rel. Branch Consultants, LLC v. Allstate Ins. Co.*, 668 F. Supp. 2d 780, 800 (E.D. La. 2009) (quoting *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 452 (5th Cir. 1995)).  Harman's information is "qualitatively different" because he aggregated a considerable amount of outside information that was "nowhere previously available." *Id.* at 800-01.  His investigation led to a connection that was previously undisclosed and has done "more than apply his expertise to publicly-disclosed information."  *Fried*, 527 F.3d at 443 (citing *United States ex rel. Reagan*, 384 F.3d at 179).  Because Harman's research led to a new conclusion about the differences between the product that was approved and Trinity's secretly modified product, his knowledge is indisputably both direct and independent.

Within the Fifth Circuit, courts favor the view that the relator only needs to have direct and independent knowledge of an essential aspect of the *qui tam* claim.  *United States ex rel. Colquitt v. Abbott Labs*, 864 F. Supp. 2d 499, 527 (N.D.Tex. 2012) ("[Relator-plaintiff's] allegations, assumed as true, demonstrate that he had direct and independent knowledge of one critical element of his off-label promotion claims …. More is not required.") and *id*. at 526 (N.D.Tex. 2012) (citing *Federal Recovery Servs.*, 72 F.3d at 451) and *Branch Consultants*, 668 F. Supp. 2d at 801 ("[T]hat [relator-plaintiff] does not have direct knowledge of the false claims themselves is not fatal to the original-source finding.").

13

Thus, Harman easily satisfies the "knowledge of the information alleged in the lawsuit" criterion – *his* knowledge is *the* essential aspect of this suit. His product measurements, his deconstruction of the different ET-Plus units, his analysis of the operational failings of the secretly modified units, the conclusions he drew from comparing his measurements to the approval, and the confirmation his attorneys gained in other litigation that Trinity made these changes without federal approval, are the underpinnings of the Complaint.

Finally, to qualify as an original source, Harman must have voluntarily provided the information to the Government before filing this action.  As noted above, Harman clearly did so.

## II.      Harman States a Claim for Trinity's Violation of the FCA.

Trinity does not – and cannot – deny that (1) it manufactured and sold a guardrail terminal after 2005 that was not approved by the FHWA; (2) it certified that such a terminal was the approved ET-Plus, even though it was not; (3) such certifications were required for the purchasers and installers to receive reimbursement from the Government for the hundreds of thousands of these terminals that were placed on the nation's highways; (4) the Government paid for those terminals as a result of such certifications; and (5) citizens have been killed or maimed in collisions with those terminals.   That is what Plaintiff has alleged, and perhaps more importantly, Trinity has admitted under oath that it never sought approval of such terminals. Harman Decl. at ¶ 13.

### A.      Trinity Made a False Statement or Claim for Payment to the Federal Government.

Trinity bases its motion primarily on its contention that Harman "does not assert that Trinity made or caused to be made a claim for payment to the Government, which is the *sine qua non* of an FCA claim, and he does not allege a causal link between any alleged false certification and a government payment."  Defs. Br. at 18.  A plain reading of the Complaint, however, totally

14

belies this assertion.  Harman clearly alleges that Trinity's undisclosed, material changes to the ET-Plus – to essentially create an "ET-Minus" – and its fraudulent certification that such units were actually the approved ET-Plus, resulted in thousands of government payments for these unapproved units.  *See* Compl. ¶¶ 2, 14, 19, 20, 21, 22, 23, 29, 31, 32, 33, 38, and 39.  It is indisputable that the Complaint clearly alleges that Trinity certified the units it manufactured and sold since at least 2005 as the approved ET-Plus knowing full well that it was not, and that these certifications directly resulted in payments from the federal government.

These certifications[7] were absolutely necessary to receive reimbursement for the units (unless Trinity is admitting it never certified the units after 2005 or, more implausibly, that the federal government never paid for such units).  Trinity knows that such certifications are absolutely necessary to sell its product, and it does not deny that fact.  If there were any doubt about the necessity for such certifications, the document specifically referenced in ¶ 27 of the Complaint, *i.e.*, the *Federal-Aid Reimbursement Eligibility Process* (attached hereto as Appendix A) unequivocally sets forth the direct link between such certifications and Federal reimbursement.  Paragraphs 38 and 39 of the Complaint unequivocally allege that such monies were paid based upon the false certifications made by Trinity.  As is more fully set forth below in Point III, Harman need not allege each and every certificate, payment or presentment in which Trinity received reimbursement.  It is sufficient that the Complaint clearly alleges "particular details of the scheme" that are "paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 189 (5th Cir. 2009).  Thus, Harman's allegations concerning Trinity's false certifications and

---

[7]    In an odd confession, Trinity essentially admits that the "fundamental" material misrepresentations in this case would be statements made by Trinity – which, presumably, are still in the hands of Trinity.  Def. Br. at 22.

resulting payments are both plausible and sufficient under *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 570 (2007).

**B.      Harman's Complaint Is Not Based on the 2005 Submission to the FHWA.**

Trinity contends that the "crux" of the Complaint is Trinity's 2005 submission to the FHWA and the resulting approval of the specific changes in that submission.  A plain reading of the Complaint, however, completely undermines such an assertion.   Trinity's 2005 request merely related to an approval to use the ET-Plus with a 31-inch high guardrail.  Trinity did a test to support the application of a 31-inch high guardrail (a height required in certain Midwestern states), but significantly (1) did not tell the FHWA that it had reduced the chute size from five inches to four inches on the ET-Plus it was selling to its customers; and (2) did not tell the FHWA that after the  2005 test (which may have used a five-inch or may have used a four-inch wide chute), Trinity made additional structural changes that impaired the performance of the ET-Plus.  The Complaint is based on Trinity's fraudulent certification of the units it was producing and selling *after* 2005 as meeting the FHWA approval process.

The Complaint details the specific unapproved changes that Trinity made to the ET-Plus. These major changes – explicitly portrayed and analyzed in Exhibit A to the Complaint (a document Trinity simply ignores) – resulted in a very different end-terminal than the approved ET-Plus.  Exhibit A provides more than ample evidence of (1) the performance and design of the approved version of the ET-Plus; (2) the undisclosed redesign of the secret unit actually produced and sold after 2005; and (3) the failure of these post-2005 units. Unfortunately for the crash victims killed and seriously injured, those hidden changes rendered those post-2005 terminals unsafe.

Trinity also distorts the relevance of its failure to provide scalable drawings.  Contrary to Trinity's assertion, Plaintiff does not allege that FHWA regulations require "scalable" drawings.

16

The fact that Trinity did not provide scalable drawings in 2005 merely demonstrates that its submission at that time did not disclose any of the relevant dimensional changes made since the ET-Plus was tested or any of the changes it made immediately following that submission. Significantly, Trinity *did* specifically and carefully reference the eight other minor modifications in its application, so the omission of the critical dimensional changes was not inadvertent. NCHRP 350 § 6.1 requires "the test article should be fully described with engineering drawings and material specifications."  Whether this means "scalable" drawings, it is undisputed that Trinity did not do that.[8]  Whether Trinity's undisclosed changes (including the crucial change in width) were "significantly different" (Def. Br. at 27), were "inconsequential to functionality" (Def. Br. at 26), or were "[im]material" "fabrication revisions" (Def. Br. at 31) is another obvious question of fact that cannot be resolved on a motion to dismiss.  In any event, Harman has clearly alleged – and Exhibit A portrays in stark realism – that Trinity did not disclose the actual existence of a "significantly different" ET-Plus after 2005.

Finally, in a flatly false statement, Trinity states that the FHWA directive – cited at Paragraph 28 of the Complaint – which states that "any deliberate misrepresentation or withholding of the conditions of FHWA's acceptance of a feature *will be cause for withdrawal of acceptance*" (emphasis added) – is inapplicable to Trinity's fraudulent conduct because it "was

---

[8]  Trinity also concealed these changes from the patent holder, Texas A&M.  Although Trinity may have informed the University of the five- to four-inch reduction in the channel, it carefully chose to conceal from Texas A&M the other significant changes it made after the 2005 test. Harman Decl. at ¶ 15.

Furthermore, Trinity's *unsupported* statement that it reduced the channel width from five to four inches in 2005 because "Texas A&M advised Trinity that its design engineers sought to reduce the lateral and vertical size of the guide channels and inquired if it could be manufactured as suggested" (Def. Br. at 7) is simply false.  In fact, Harman will show that, although Texas A&M made such a suggestion in 2003, Trinity tabled that idea.   In 2005, however, Trinity did make such a change, but not at the request of Texas A&M; rather, Trinity unilaterally made such a change simply to save costs and increase profits.  Compl. ¶ 24.

not issued until May 21, 2012." Def. Br. at 27 (citing Compl. ¶ 28).  That statement by Trinity is untrue.  As clearly set forth in this document, which is specifically referenced in the Compl. ¶¶ 28-29 and attached hereto as Appendix B**,** it was issued on July 25, 1997, *not* in 2012.  Thus, it is controlling on *all* of Trinity's conduct alleged in the Complaint.[9]  In addition to the unequivocal statement that "any deliberate misrepresentation or withholding of the conditions … *will be* cause for withdrawal of acceptance" (Appendix. B at 4), this document also specifically sets forth "Submission Requirements" for Trinity to "fully identify," including:

> the feature(s) tested; … the complete design, construction, and installation details and specifications for the version(s) of the feature for which acceptance is being sought.  (Appendix B at 9).
>
> **. . . .**

The document goes on to emphasize why these details are so critical.  Further, Trinity "must" supply a

> letter-size drawing or set of drawings showing the feature and its installation in sufficient detail to be used to make dimensional checks of service installations.  (Appendix B at 10).

It is indisputable that Trinity failed to fulfill any of these requirements with respect to its secret modifications to the ET-Plus.  In any event, Trinity cannot argue that material misrepresentations to FHWA would not result in revocation of certification.

### C.     Harman's Complaint Is Not Barred By Any Statute of Limitations.

Under a unique and creative interpretation of the law, Trinity contends the Complaint should also be dismissed because Harman's claims are barred by the statute of limitations. Trinity argues that because its fraudulent conduct began more than six years ago all of its continuing and current fraudulent conduct is excused.  In essence, Trinity's argument is:  "if you

---

[9]  This directive was superseded in 2012, but this 1997 directive was undeniably controlling on all of Trinity's fraudulent conduct alleged in the Complaint.  The 2012 directive is not materially different.

want to get away with fraud, commit it early and commit it often and hope that nobody catches

you for six years – if so, you can get away with it."  That is not the law.

Under the FCA, an action must be brought within six years of the fraud or, pursuant to its

tolling provision, three years from the date "when facts material to the right of action are known

or reasonably should have been known by the official of the United States charged with

responsibility to act in the circumstances, but in no event more than 10 years after the date on

which the violation is committed."  31 U.S.C. § 3731(b).  When the government declines to

intervene in the action (as here) the relator does not get the benefit of the FCA three-year

equitable tolling period, and the claim may not be brought more than six years after the date on

which the violation is committed.  *See United States ex rel. Foster v. Bristol-Myers Squibb Co.*,

587 F. Supp. 2d 805, 816 (E.D.Tex. 2008); *United States ex. rel. Erkstine v. Baker*, 213 F.3d

638, 2000 WL 554644, *1-2 (5th Cir. 2000) (unpublished table decision).

Thus, *all* of Trinity's fraudulent certifications of the ET-Plus – going back at least six

years from the filing of this Complaint to the present – are clearly *not* barred by any statute of

limitations.  *United States ex rel. Gonzalez v. Fresenius Med. Care North Amer.*, No. EP-07-CV-

247-PRM, 2010 WL 1645969, *8 (W.D.Tex. Jan 21, 2010) (dismissing only claims that fell

outside the six-year statute of limitations period); *United States ex rel. Barrett v. Johnson

Controls, Inc.*, No. 3:01-CV-1641-M, 2003 WL 21500400, *11 (N.D.Tex. Apr. 9, 2003)

(dismissing only claims regarding alleged false claims by defendant and his subcontractor that

fell outside the six-year statute of limitations period); *United States ex rel. Foster*, 587 F. Supp.

2d at 815 ("conduct outside the limitations period can still trigger a claim inside the limitations

period" (citing *Smith v. United States*, 287 F.2d 299, 303 (5th Cir. 1961)).

**D.      Trinity's Fraudulent Statements and Non-Disclosures Were Directly Responsible for Payments by the Federal Government.**

By continually focusing solely on its 2005 application and the corresponding FHWA approval of the disclosed (as opposed to the *undisclosed*) changes, Trinity attempts to absolve itself from any fraud that caused the Government to pay for Trinity's post-2005 guardrail terminals.  Trinity ignores the fact that the fraudulent statements that caused such monies to be paid were not the 2005 documents.   The fraudulent statements were the thousands of certifications Trinity issued stating that the post-2005 ET-Plus units it manufactured and sold were the FHWA-approved version of that terminal, and *not* the secretly altered unit that Trinity actually provided to those purchasers.  Those are the false or fraudulent statements that caused the federal government to pay out millions of dollars – money spent for a product (unbeknownst to both the purchasers and the government) that was not approved, and worse, that would eventually kill and seriously injure hundreds of citizens, if not more.

As set forth in section II.A above, the Government's payments for these units were based upon Trinity's certification.  Without such certifications, no payments would have been made. These post-2005 units were definitely installed.  *See* Ex. A to Complaint (photographs of post-2005 units installed on the interstate highways in various states).  Unless Trinity donated such units to the purchasers, or the purchasers did not bill the government for these units (which cost thousands of dollars to install), such reimbursements were certainly paid.  *United States ex rel. DeKort v. Integrated Coast Guard Systems*, 705 F. Supp. 2d 519, 539-40 (N.D.Tex. 2010) (relator "not in possession of all the contract documents" satisfied the FCA and Rule 9(b) if it can be "reasonably inferred from the allegations of the Complaint" that certification from the defendant was a condition of payment from the government).

### E.    Harman Is Not Challenging the FHWA's Decision-Making Authority.

Harman does not "disagree [] with the decisions of the FHWA" (Def. Br. at 2) and that is

not alleged in the Complaint.  Rather, this case reveals that the true dimensions and limitations –

indeed, the actual existence, of a unit significantly different than the approved unit – has *never*

been disclosed to the FHWA.  It is alleged (and true) that Trinity did not disclose the significant

five- to four-inch reduction in the width of the chute in 2005,[10] nor did it disclose the other major

changes in the post-2005 units it produced and sold.[11]  *But*, it is Trinity's decision to conceal this

---

[10]   Trinity coyly makes it sound like this significant reduction was disclosed to the FHWA in
2005 (Def. Br. at 4), but it was not.  Trinity never disclosed to the FHWA any reduction in the
width of the chute until 2012, and, only after first denying that it made any change.  Compl. ¶ 31;
Harman Decl. at ¶ 14.  Indeed, a submission to the FHWA in 2009 continued to represent the
ET-Plus as having a five-inch wide chute.  *See* Ex. A to Complaint.  It was only *after* Harman's
discoveries that Trinity represented – for the first time in 2012 – that the crash tests it performed
in 2005 were supposedly using a version of the ET-Plus with a four-inch wide chute. Compl. ¶
31.  However, even this claim by Trinity is hotly disputed by the parties as one or more photos
Trinity has claimed in the past to evidence use of a four-inch cute in that 2005 crash test
appeared to use a five-inch chute.

[11]   In addition to shrinking the feeder chute, Trinity also failed to disclose other crucial changes
to the ET-Plus that further contributed to its failure to perform as the approved unit:

> Trinity reduced the height of the chute by approximately 3/8-inch.  Trinity
> changed the type of weld used which caused the chute to intrude into the
> roof and floor space of the extruder chamber resulting in an additional
> reduction of ½ of an inch in the height of the extruder chamber.

> Trinity made an additional 1/8-inch reduction in the height of the chute
> (ultimately all of these changes reduced the height of the extruder channel
> by one inch).

> Trinity also shortened the length of the chute by 3/4-inch.

> Trinity shrunk the exit gate by approximately 1/2-inch resulting in a 33%
> decrease.

Compl. ¶¶ 15, 23, 31, 35; Compl. Ex. A.

These secret alterations to the ET-Plus saved Trinity money (Compl. ¶ 24) but, because these
undisclosed reductions caused the guardrail to lock in the throat of the unit (unlike the approved

crucial information regarding the safety and non-approval of such units from purchasers that is the basis of Harman's claims, *not* any decision by the FHWA. Compl. ¶¶ 29, 30. Indeed, rather than tell the truth about its post-2005 product and the limited disclosures it made to the FHWA and, in particular, its concealment of *all* of the secret changes to the original and approved ET-Plus, Trinity goes well outside the allegations of the Complaint to disparage Harman. *See* Def. Br. at 2.[12]

Trinity baldly states that the FHWA reviewed Harman's allegations last year and determined the ET-Plus "*has been and is eligible for reimbursement*" (Def. Br. at 1). This not only misrepresents the truth of the communications between Trinity and the FHWA in 2012, it is contrary to the allegations of the Complaint. Moreover, Trinity can offer no support for such a statement. Instead, it claims – unremarkably – that "the ET-Plus remains fully eligible for federal reimbursement, despite Harman's crusade" (Def. Br. at 1). Indeed, the ET-Plus – the product approved in January 2000 (including the 2005 minor modifications that were actually disclosed to the FHWA) – has *always* been eligible for federal reimbursement, *but* Trinity has *not* been manufacturing and selling that previously approved product for more than eight years. Compl. ¶¶ 12, 14, 22, 36, 38. Instead, it is selling what is essentially an "ET-Minus," *i.e.*, an ET-Plus, *minus* much of the integral structure of the actual product approved by the FHWA and *minus* most of the safety afforded by the original ET-Plus. Worse, Trinity has never revealed

---

ET-Plus), resulting in a destruction of these once reusable heads and a sale of a new replacement. These savings were made at the expense of accident victims. Compl. ¶¶ 3, 14.

[12] Harman is not on a "crusade," he is not "an opportunistic" and "parasitic litigant" (Def. Br. at 2 and 12), he is not "retaliat[ing] against Trinity" (*id.*), and such unnecessary falsehoods will not be given credence in the body of this Response. Trinity also seeks to impugn Harman by stating that he initiated this lawsuit after Trinity sued his companies for infringing the patents covered by the ET-Plus – but Trinity neglects to report the fact that such litigation was mutually resolved *after Harman's companies moved for sanctions against Trinity.*

this subtraction in both the design and manufacture of this "ET-Minus" to the FHWA.[13]Compl. ¶¶ 29, 31, 32, 33.

Trinity also misrepresents the 2012 "approval" of the FHWA.  Trinity fails to tell the Court that it intentionally misrepresented to Mr. Artimovich of the FHWA that the *only* change to the ET-Plus was the reduction of the feeder channel from five to four inches.  Compl. ¶ 31. Trinity specifically withheld the fact that it had also significantly shrunk other vital portions of the ET-Plus (such as the interior vertical clearance of the feeder chute and the exit gate (Compl. ¶ 31)) which caused the unit to "throat lock."  Significantly, Trinity never provided the FHWA any drawings of these changes and represented that the unit tested in 2005 was identical to the units it was selling in 2012 – that, of course, was false.  Compl. ¶ 32.

In any event, what the FHWA knew in 2012 and exactly what Trinity disclosed at that time is a clear question of fact.  "[W]hether the Government's knowledge was so complete as to disprove that Defendants' false claims were made knowingly is a fact issue, and not a basis for a Rule 12 motion."  *United States ex rel. DeKort*, 705 F. Supp. 2d at 543-44 ("'government knowledge bar' was repealed in 1986 … and government knowledge of a contractor's wrongdoing is no longer an automatic defense to an FCA action").

Finally, the fact that the Government has decided not to intervene in this action has absolutely no bearing on the merits of this case.  *See United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006) (Because the government may have multiple reasons for not pursuing a claim, courts "do not assume that in each instance in which the government

---

[13] Without any supporting authority, Trinity raises a defense that "it cannot make design changes to the ET-Plus" due to the patent of Texas A & M University and Trinity's licensing agreement with the University (Def. Br. at 3).  Even if true, that "fact" has no bearing on this Plaintiff's allegations – because it has not stopped Trinity from admittedly doing just that – Trinity *has* made numerous undisclosed and unapproved design changes to the ET-Plus (many of which it concealed from Texas A&M).  This may form the basis of a separate breach of license or patent infringement case by the University.  But that is a case for a different court.

declines intervention in an FCA case, it does so because it considers the evidence of wrongdoing insufficient or the qui tam relator's allegations [of] fraud to be without merit.").   Non-intervention does not necessarily signal governmental disinterest in an action, as it is entitled to most of the proceeds even if it opts not to intervene.   "Even in cases where the government does not intervene, there are a number of control mechanisms present in the *qui tam* provisions of the FCA so that the [government] nonetheless retains a significant amount of control over the litigation."   *Riley v. Saint Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001).

### III.      Harman's Claims Satisfy the Requirements of Rule 9(b).

Trinity contends that Harman's Complaint falls short of the pleading requirements under Rule 9(b) "in every way," Def. Br. at 34.   However, Harman's Complaint clearly alleges sufficient details to meet Rule 9(b)'s pleading standard.   He has specifically alleged:   "(1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys." *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009), *cert. denied* 130 S.Ct. 2092.

The Fifth Circuit has long held that claims brought under the FCA must comply with the requirements of Rule 9(b).   *See, e.g.*, *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997); *United States ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308 (5th Cir. 1999).   Despite the 9(b) pleading standard, however, the Fifth Circuit has more recently affirmed that "Rule 9(b)'s ultimate meaning is context specific, and thus there is no single construction of Rule 9(b) that applies in all contexts." *Grubbs*, 565 F.3d at 188 (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997) (quotation marks omitted).   "A plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' without including all the details of any single court-

24

articulated standard – it depends on the elements of the claim at hand." *Grubbs*, 565 F.3d at 188.

"It is adequate to allege that a false claim was knowingly presented regardless of its exact amount; the contents of the bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim." *Id.*, 565 F.3d at 189.  Thus,

> [i]n sum, the 'time, place, contents, and identity standard is *not a straitjacket* for Rule 9(b).  Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claims Act.  We reach for a workable construction of Rule 9(b) with complaints under the False Claims Act; that is, one that effectuates Rule 9(b) *without stymieing legitimate efforts to expose fraud.*  We hold that to plead with particularity the circumstances constituting fraud for a False Claims Act … a relator's complaint, [even] if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.

*Id*. at 190 (emphasis added).

Here, Harman has more than simply alleged "details of a scheme to submit false claims and has clearly alleged this with reliable indicia and, moreover, there can be no doubt that this is a "legitimate effort to expose fraud." *See*, *id.*

### A.    Harman States the Specifics of Trinity's Fraudulent Scheme With Sufficient Particularity to Satisfy FRCP 9(b).

To satisfy the pleading standard of 9(b) in the Fifth Circuit, a plaintiff must state with specificity the claim itself, the person who submitted the claim, plus the time, place, and contents of the claim.  *See, e.g.*, *United States ex rel. Rafizadeh v. Continental Common, Inc.,* 553 F.3d 869, 872-73 (5th Cir. 2008). This is often referred to as the "who, what, where, when, and how" of the fraud*. See, e.g.*, *id.* at 874; *Thompson*, 125 F.3d at 903.  *See also Grubbs*, 565 F.3d at 190 (calling the same analysis a "time, place, contents, and identity" standard).   Analyzing each element in turn, Harman's Complaint satisfies these requirements of Rule 9(b).

*Who* — Harman identifies the two Trinity employees who were the impetus for the modifications to the ET-Plus.  Compl. at ¶ 19.  As to the false statements or claims for payment presented to the government, Harman's Complaint specifically identifies Trinity[14] as the party providing the false certifications that "contractor-purchasers" and "state authorities" forwarded as part of their invoices to the federal government.  Compl. at ¶ 38.

*What* — The Fifth Circuit has held that a relator cannot merely allege conclusory "fraudulent schemes," but must also allege specifics about the false claims that were actually submitted.  Harman more than sufficiently alleges a far-reaching fraudulent scheme in his Complaint.  Compl. at ¶¶ 15-24, ¶¶ 29-39.  Moreover, any allegations based on "information and belief," where the documentation is only available from a defendant such as Trinity, are permissible under the Fifth Circuit's exception which loosens the pleading standard.  *See* pp. 28-29, *infra.*

Additionally, Harman has sufficiently shown a connection between Trinity's fraudulent scheme and the misrepresentations in claims submitted to the government to satisfy Rule 9(b).  *See Grubbs*, 565 F.3d at 190.  Here Harman's Complaint "alleg[es] particular details of a scheme to submit false claims paired with reliable indicia that *lead to a strong inference* that claims were actually submitted."  *Grubbs*, 565 F.3d at 190 (emphasis added).  For example, the Complaint states "every time Trinity sold the ET-Plus after the secret 2005 modifications, it necessarily provided a false certification" and "thousands of dangerous and unapproved ET-Plus heads have

---

[14]   Whether Trinity Industries, Inc. or Trinity Highway Products LLC (or both) provided these false certifications is irrelevant at this juncture.   These inter-related entities have the same business address and, as alleged, both are involved in the production, sale, and certification of the subject terminals.   In the patent action brought by Trinity against Harman's companies, officers of both entitles provided declarations attesting to the "ET-Plus" sold by Trinity.  *See* July 5, 2013 Declaration of George F. Carpinello and exhibits thereto.   Trinity's cases involving disparate individuals alleged as a single entity are inapplicable to this case.   Moreover, the information as to which entity or entities made these certifications is in Trinity's hands and will only be available to Plaintiff when discovery is completed.

been passed off by Trinity as approved by the FHWA and eligible for federal reimbursement to purchasers." Compl. at ¶ 38.  Harman also states that "[w]ithout Trinity's false certifications, the purchasers would not have purchased the ET-Plus heads, and the state and federal governments would not have relied on those certifications and approved either payment or reimbursement for those ET-Plus heads." Compl. at ¶ 39.

Although Harman is "not in possession of the contract documents" between Trinity and the ET-Plus purchasers, it can be "reasonably inferred from the allegations of the Complaint" that Trinity's certification of the these units was "a condition of payment" from the government. *DeKort*, 705 F. Supp. 2d at 539-40.

*When* — The Fifth Circuit has also held that, in order to satisfy the heightened Rule 9(b) pleading standard, the complaint must include specifics about "when" the fraudulent scheme occurred.  *See, e.g.*, *Grubbs*, 565 F.3d at 191-92 ("Grubbs describes in detail, including the date, place, and participants, the dinner meeting at which two doctors in his section attempted to bring him into the fold of their on-going fraudulent plot").  Although Harman does not identify a specific date on which a false claim was made in his Complaint, he alleges that Trinity's secret modifications and fraudulent certifications had been continually occurring "[s]ince 2005."  *See United States ex rel. King v. Alcon Labs., Inc.*, 232 F.R.D. 568, 572 (N.D.Tex. 2005); Compl. at ¶ 38.  The photographic evidence of numerous post-2005 installations in Compl. Ex. A clearly supports this fact.  In any event, "when" the false certifications and the resulting claims to the government were made is not required.  *Grubbs*, 565 F.3d at 192-93.

Other district courts in Texas abide by the holding in *Grubbs*.  In a case involving payment for fighter jets, "because the FCA lacks the elements of reliance and damages present in a common-law-fraud claim, there is no heightened need for pleading specific and expanded detail regarding the contents of the misrepresentation itself in an FCA claim." *United States ex*

27

*rel. Davis v. Lockheed Martin Corp.*, No. 4:09-cv-465-X, 2010 WL 4607411, at *6 (N.D.Tex. Nov. 15, 2010) (*citing Grubbs* at 189) (contractor did not follow required software development standard for use in fighter jets, but falsely represented to the government that the standard was met). Indeed, "Rule 9(b) does not operate in isolation, but should rather be read 'as part of the entire set of rules', including Rule 8(a)'s insistence upon 'simple, concise, and direct allegations.'" *Abbott v. B.P. Exploration and Prod., Inc.*, 781 F. Supp. 2d 453, 467 (S.D.Tex. 2011) (*quoting Williams*, 112 F.3d at 178) and *citing Grubbs*, 565 F.3d at 188 (oil company's false certification of compliance with environmental and safety regulations resulted in oil company unlawfully acquiring oil and gas revenue).

*Where* — The Fifth Circuit has held that the complaint must allege the location of the fraudulent scheme and the specifics surrounding the place where the scheme and the claims were submitted.  Harman's Complaint specifically states the location of Trinity's offices.  Compl. at ¶¶ 5, 8.  Locations such as the place of the meeting between Trinity and FHWA administrators can properly be inferred from context.  *See*, *e.g.*, Compl. at ¶¶ 31-32.  Moreover, the Complaint at ¶ 38 states that certifications were "made to every state."  Harman's Complaint cannot, *and need not*, allege the states in which the faulty heads are located or which states have sought reimbursement for installing the Trinity heads on their roads because that information lies solely within the domain of Trinity.  In any event, the photographic evidence in Compl. Ex. A shows the failed installation of the post-2005 units at specific interstate mile markers in at least four states – Tennessee, Virginia, Arkansas, and Texas.

*How* — The Fifth Circuit requires a plaintiff to allege facts that explain how the fraud was committed.  *United States ex rel. King*, 232 F.R.D. at 572.  At a minimum, the plaintiff must allege enough information to show the existence of a fraudulent scheme.  *See Grubbs*, 565 F.3d at 191 (stating that a complaint will either show that parties "have or do not have evidence" and

that the government should have complete information when deciding whether to intervene in a *qui tam* suit).  The majority of Harman's Complaint clearly has to do with the "how" element of Trinity's fraudulent scheme.  Harman details Trinity's actions leading up to the modifications, details the modifications themselves, the lack of approval for the modifications, and the meetings with the FHWA that led up to this suit.  Compl. at ¶¶ 10-37.  He alleges specific regulations that Trinity did not comply with, and lists facts, such as the measurements of the modified product, that back up his allegations.  Compl. at ¶¶ 25-29, 40-43.  Thus, because Harman's Complaint lists more than enough factual evidence to allege that a fraudulent scheme plausibly took place, it satisfies the 9(b) heightened standard.

Even if this Court were to determine that Harman had not met this standard, the Fifth Circuit has recognized two exceptions to this pleading standard.  First, the pleading requirements are relaxed "when, for instance, the facts relating to the fraud are 'peculiarly within the perpetrator's knowledge.'"  *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 330 (5th Cir. 2003) (quoting *Russell*, 193 F.3d at 308).  In such situations, fraud may be alleged based on mere "information and belief."  *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 385 (5th Cir. 2003).  Here, the thousands of certifications that Trinity issued are not available to Plaintiff, and are "peculiarly within [Trinity's] knowledge."[15]

Second, District Courts in the Fifth Circuit have relaxed Rule 9(b)'s pleading standard where the alleged fraud (i) occurred over an extended period of time, and (ii) consisted of numerous acts.  "In such cases, courts have allowed the plaintiff to plead the fraudulent scheme

---

[15]  The purpose of this rule was laid out in *United States ex rel. Polansky v. Pfizer, Inc.*, No. 04-CV-0704, 2009 WL 1456582 (E.D.N.Y. May 22, 2009).  "The rationale for reducing the pleading burden when information is in the defendant's possession appears to spring from the fact that an adverse party would not willingly divulge incriminating information. *Id.* at *8; *see also United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006).

with particularity and provide representative examples of specific fraudulent acts conducted pursuant to that scheme."  *United States ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 768-69 (S.D.Tex. 2010) (quotation marks omitted).  In those cases, a heightened pleading standard still applies, but "the specificity requirements of Rule 9(b) are applied less stringently." *United States ex rel. King*, 232 F.R.D. at 570.  Here, Plaintiff's claim satisfies Rule 9(b), because he has plead specific details regarding Trinity's secret alteration to the ET-Plus, its fraudulent certifications, the specific time frames of these actions, and to the groups of parties affected.

Although the exceptions "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations" (*Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)), these exceptions allow fraud to be brought to light even when the entire details of a scheme are not known by the plaintiff.[16]

## CONCLUSION

For all of the foregoing reasons, Trinity's Motion to Dismiss should be denied in its entirety.

Dated:  July 15, 2013

/s/ Josh B. Maness
Josh B. Maness
(Texas State Bar No. 24046340)
PO Box 1785
Marshall, TX  75671
Ph: (903) 407-8455
manessjosh@hotmail.com

---

[16]  Although Plaintiff obviously believes the allegations of his Complaint are more than sufficient to survive this motion to dismiss, should this Court determine that Plaintiff has failed to adequately allege an aspect of his claim, Plaintiff respectfully requests leave to amend his Complaint.  Although the original sealed Complaint was amended once (as of right) before Trinity filed any response, Plaintiff has never moved for leave to amend.

Justin Kurt Truelove
(Texas State Bar No. 24013653)
TRUELOVE LAW FIRM, PLLC
100 West Houston
Marshall, TX  75670
Ph: (903) 938-8321
Kurt@truelovelawfirm.com

Nicholas A. Gravante, Jr.
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY  10022
Ph: (212) 446-2300
ngravante@bsfllp.com

George F. Carpinello
BOIES, SCHILLER & FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, NY  12207
Ph: (518) 434-0600
gcarpinello@bsfllp.com

Karen Dyer
BOIES, SCHILLER & FLEXNER LLP
121 South Orange Avenue, Suite 840
Orlando, FL  32801
Ph: (407) 425-7118
kdyer@bsfllp.com