# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. JOSHUA HARMAN, | ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. 2:12-CV-89 |
| v. | ) ) | |
| TRINITY INDUSTRIES, INC, and TRINITY HIGHWAY PRODUCTS, LLC, | ) ) ) | |
| Defendants. | ) | |

**SUPPLEMENTAL DECLARATION OF JAMIE SCHAEFER-WILSON IN SUPPORT OF THE SAFETY INSTITUTE'S RENEWED MOTION TO INTERVENE**

I, Jamie Schaefer-Wilson, declare as follows:

1. I am the Executive Director of The Safety Institute (the "Institute"), a 501(c)(3) non-profit organization with headquarters in Rehoboth, Massachusetts. I am submitting this declaration in support of the Institute's Renewed Motion to Intervene to seek to unseal the records in this litigation.

2. As explained below, The Safety Institute, in partnership with a university, recently released an initial study analyzing severe and fatal injury crashes that occurred as a result of impacts with the end and/or face of guardrail terminals. A principal goal of the study was to analyze the safety performance of all guardrail end terminal types, including the ET-Plus, which is one of the key issues in this litigation. That study was an important first step in analyzing the safety and relative safety of guardrail end terminals. The Institute is planning to continue studying the safety of guardrails and guardrail end terminals, particularly as more data becomes available. The Institute is seeking access to the sealed court records in this case because they are directly relevant to its further

1

research and could shed significant light on this important issue of public health and safety.

**My Background**

3. Prior to my tenure at The Safety Institute, I was the Associate Director of Multimedia Outreach at Consumers Union, the policy and action division of Consumer Reports, where I wrote "The Consumer Reports Guide to Childproofing and Safety." In my role at Consumers Union, I launched several consumer safety programs including The School Safety Alert Program, which brought together educators, teachers, government, school boards, parent-teacher groups, principals, and school administrators to communicate vital safety and recall information. As a result I launched "The National School Safety Coalition" consisting of more than 30 non-profit partners including three government agencies—the Consumer Product Safety Commission, the Federal Trade Commission, and the Food and Drug Administration.

4. During my employment with Consumers Union, I also worked as a registered lobbyist and safety advocate. In that capacity, I worked to improve legislation involving vehicle safety, consumer products, and food, including The Cameron Gulbransen Kids Transportation Safety Act, The Consumer Product Safety Improvement Act, and The Food Safety Modernization Act.

5. I am a member of ASTM and serve on several juvenile product subcommittees and task-groups. I received an award in the 2007 ASTM International Advantage Award paper competition regarding the effectiveness of voluntary safety standards towards reducing injuries and fatalities.

6. In addition to writing "The Consumer Reports Guide to Childproofing and Safety," I've

written safety articles for several parenting magazines and websites. I was previously a certified Child Passenger Safety Technician and have spent the past ten years volunteering with the non-profit KidsAndCars.org.

**The Safety Institute's Overall Mission**

7. The overall focus of The Safety Institute is on injury prevention, product safety, and public awareness. The Safety Institute examines areas of injury prevention and product safety across a broad spectrum. The Institute bases its plans and priorities on issues that require greater study and emphasis, as well as those which may be underserved by other organizations and advocates. The Institute gives special attention to those areas of emerging importance to injury and product safety, including the effects of new and changing technologies.

8. A key mission of The Safety Institute is to support evidence-based research and interventions aimed at reducing injuries and improving product safety and to provide a strong, independent voice for safety professionals and survivors seeking to influence and advance prevention policies and strategies.

9. The Safety Institute is currently involved in, or has led efforts in a variety of issues regarding product safety and injury prevention. These include: water safety, preventing window falls, all-terrain vehicle safety, motor vehicle safety, restaurant and occupational safety, motor vehicle electronics, prevention of traumatic brain injury, regulating off-road vehicles, preventing falls among older adults, injuries from new technologies products and practices, recall effectiveness and outreach program (upcoming launch), effectiveness of guardrail end terminals, and residential elevator safety.

10. In mid-2014, the Safety Institute began releasing quarterly Vehicle Safety Watch Lists of

potential safety-related defects. The list is a product of the Institute's Vehicle Safety Watch List Analytics and the National Highway Traffic Safety Administration's Enforcement Monitoring Program. The reports help the public recognize the early signs of emerging, potential problems in the U.S. fleet. The reports also help to identify continuing potential failures to effectively fix issues that are already known.

**The Institute's Interest in This Litigation and the ET-Plus**

11. One of the issues currently being studied by the Institute is the safety of highway guardrails. Throughout the course of its investigation into highway safety issues, the Institute has become aware of the increasing controversy regarding the guardrail end terminal ET-Plus, which is manufactured by the defendants in this case. Of particular concern is the lack of sufficient data regarding the safety performance of this device. Among other things, the Institute has learned the following:

12. In 2012, Joshua Harman, the Relator in this case, informed the Federal Highway Administration (FHWA) that the ET-Plus had been modified in a way that was not reflected in the record on which its federal approval was based. This information touched off a controversy involving the manufacturer, the FHWA, and state departments of transportation.

13. In October 2012, the American Association of State Highway and Transportation Officials (AASHTO) sent its membership a questionnaire concerning the field performance of the ET-Plus. Three of the 21-member agencies that responded stated that guardrail end terminals were involved in three severe crashes that caused serious injuries and deaths. Two members specifically referenced the ET-Plus. AASHTO requested that the FHWA review the crash acceptance of the ET-Plus end terminal and document that

4

the modified barrier system was sufficiently crashworthy.

14. In response, the FHWA assured AASHTO that there was no "reliable data indicating that the ET-Plus end terminals are not performing as they were intended to perform," and affirmed that the device was still eligible for reimbursement.

15. The Safety Institute decided to take action to address the lack of "reliable" field performance data related to the ET-Plus. Earlier this year, The Safety Institute formed a partnership with the University of Alabama to study severe and fatal injury crashes that occurred as a result of impacts with the end and/or face of guardrail terminals. That study was initially released to the public in September 2014, and the final report was released in October 2014. The initial study is available at http://www.thesafetyinstitute.org/wp-content/uploads/2014/09/In-Service-Evaluation-of-FHWA-Accepted-Guardrail-Terminals.pdf, and the final report is available at http://www.thesafetyinstitute.org/wp-content/uploads/2014/10/Relative-Comparison-of-NCHRP-350-Accepted-W-Beam-Guardrail-Terminals.pdf.

16. The objective of the study was to investigate the in-service performance of guardrail end terminals between 2005 and 2014, including the ET-Plus. The study incorporated a statistical estimate of the relative risks of fatal and/or serious injury crashes involving each of the widely used guardrail end terminals in two states. The research study is an objective analysis of crashes involving all guardrail end terminal types in the marketplace. Though there was not sufficient data to make conclusions regarding all guardrail types in all states, the study found that, in the states studied, the redesigned ET-Plus was 1.36 to 1.95 times more likely to produce a severe injury, and 2.86 to 3.95 times more likely to produce a fatality than the original ET-2000.

17. Though the study is an important first step, because of the limited data that was available, additional study is needed. The Safety Institute is continuing to research the safety of guardrail end terminals and is considering sponsoring a follow-up study of guardrail end terminal safety that would incorporate additional information.

18. In light of its involvement in the continued research of end-terminal safety, The Safety Institute has a strong interest in obtaining access to the sealed court records in this case. The records sealed in this case may include crash test videos and reports, computerized crash simulations, and other significant records regarding the performance of the ET-Plus. Such information could be valuable to the Institute's ongoing research.

19. Further, such information could be invaluable to state departments of transportation. Since the release of the Institute's study and the jury verdict in this case, 44 states and 1 U.S. territory have placed a moratorium on the purchase and installation of the ET-Plus over safety concerns. Further, three Canadian provinces have also ceased the use of these terminals. The additional information and the study of it could help states determine whether, for example, they need to replace the ET-Plus end terminals currently installed along their highways, as Virginia has already begun to do.

20. The Safety Institute's interest in access to the sealed court records in this case is further demonstrated by advocacy undertaken by the President of The Safety Institute's Board of Directors, Sean Kane. In addition to this role, Mr. Kane is Editor of *The Safety Record*. Established in 2005, *The Safety Record* is a publication on motor vehicle, highway, and consumer product safety. *The Safety Record*'s objective is to educate the press, policymakers, and the general public about motor vehicle, highway, and product safety issues.

21. *The Safety Record*'s frequently visited website, http://www.safetyresearch.net/the-safety-record-blog/, reports the latest developments and provides in-depth information, commentary and analysis about a wide variety of motor vehicle, highway, and product safety issues. *The Safety Record*'s website also posts documents received in response to various Freedom of Information requests, along with accompanying analysis and commentary, and provides the public with context around government rulemaking, investigations, and legislation in the areas of safety.

22. As Editor of *The Safety Record*, Mr. Kane has published articles specific to the lack of government transparency as it relates to documents surrounding alleged defects associated with the Trinity ET-Plus end terminal. Http://www.safetyresearch.net/blog/articles/safety-research-strategies-sues-fhwa-guardrail-documents; Http://www.safetyresearch.net/blog/articles/srs-sues-florida-dot-guardrail-docs. In addition, Mr. Kane and his company, Safety Research & Strategies, has sued the U.S. Department of Transportation and the Florida Department of Transportation related to unwarranted records withholding pertinent to the design, development, acceptance, testing and related communications surrounding the safety and efficacy of the Trinity ET-Plus end terminals.

23. In short, The Safety Institute and its Board Members feel strongly that documents filed under seal in this action are of immediate importance to the motoring public. Motorists operate their vehicles on roadways nationwide upon which these terminals are equipped. We have an opportunity and an obligation in support of our organization's mission and on behalf of the motoring public and their passengers to protect them from undue harm. If these records shed any light on the safety record of the ET-Plus, the public has a right

>to know, and the Institute is committed to ensuring that any such information is used to shed light on this important public safety issue.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: November 20, 2014

*[signature: Jamie Schaefer-Wilson]*

_____

Jamie Schaefer-Wilson,
Executive Director, The Safety Institute